IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REGINALD WILLIAMS,<br><br>                    Plaintiff,<br><br>     v.<br><br>BLACKROCK, INC., MICHELLE EDKINS, GASSIA FOX, and JENNY CHOW<br><br>                    Defendants. | CIVIL ACTION<br><br>Jury Trial Demanded |

## **COMPLAINT**

Plaintiff Reginald Williams ("Plaintiff"), as and for his claims against BlackRock, Inc. ("Defendant" or "BlackRock"), Michelle Edkins ("Edkins"), Gassia Fox ("Fox"), and Jenny Chow ("Chow") hereby alleges as follows:

Preliminary Statement

1.     BlackRock is the world's largest asset manager with $9.5T in assets under management and self-styled champion of good corporate citizenship and social justice but counts just 5% of its 16,000 employees as Black.

2.     Following the social justice protests of Summer 2020, however, BlackRock went to great lengths to publicly tout its commitment to increasing diversity and inclusion.

3.     In June 2020, BlackRock Chairman and CEO Larry Fink announced in a company-wide memo that BlackRock had an "action plan" to "advance racial equity and inclusion" that included "actively

guiding and developing" the careers of the company's Black employees.

4.     In a company-wide town hall meeting held via conference call in the days following the memo's release, Fink touched on the points made in the memo he ostensibly drafted but then went on to disclaim that no one should want to hear from him on matters of racial diversity because he is 'just another old white guy'.

5.     BlackRock managers and employees happening to identify with any combination of "old" or White or male have followed Fink's example, duly, glibly, and gladly excusing themselves from the employment decisions required to increase racial diversity at BlackRock.

6.     Into this void have come BlackRock's female managers and employees, filling the breach left by Fink's abdication on racial diversity to create opportunities for ever increasing numbers of female employees at BlackRock at the expense of male employees generally and black male employees in particular.

7.     In a well-chronicled phenomenon, BlackRock's ostensible push for racial diversity has been supplanted by ever more aggressive efforts at gender diversity (see "Coke's Elusive Goal: Boosting Its Black Employees").

8.     BlackRock's internal human resources efforts feature almost exclusively female employees, who tout the ease with which employees are supposedly able to capitalize on opportunities to work in the company's various departments just by "raising their hand". No such production has ever featured male or Black employees.

9.     Indeed, the meteoric career arcs of BlackRock star female employees like Jessica Tan and Cameron Leax who have headlined the company's internal mobility messaging efforts are reflected in the careers of female employees like Rachel Barry, now BlackRock's Chief Operating Officer of External Affairs after only seven years with BlackRock after joining the company directly out of college.

10.    Contrast Barry's example with that of her brother, Henry, a fellow BlackRock employee who attained just a Vice President title in an investment strategy division after more than six years at the company before leaving to pursue an MBA.

11.    BlackRock would be hard pressed to produce a similar array of male employees (racial minority or not) who have risen at such an accelerated pace. And even such male employees in any significant number, BlackRock would most certainly take pains *not* to publicize and promote their ascent as examples to other employees.

12.    Then there are examples like that of Charlotte Hickey, who as an Associate on the Defined Contribution Retail Sales Desk with Plaintiff, beat out two more qualified white men (Alexander Castrichini and Jeremy Fletcher) for a coveted role on a BlackRock National Accounts team.

13.    Unifying each of these examples is the undue influence female managers at BlackRock are allowed in the company's misguided pursuit of racial diversity and inclusion-turned-gender diversity and inclusion.

14. Indeed, BlackRock has a pattern and practice of promoting women at higher rates than men, and Whites at higher rates than Blacks.

15.    In service to this display of corporate wokeness run amok, low-level employees are deputized to publish across social media outlets saccharine odes to BlackRock's efforts on diversity. This to test the bona fides of rank-and-file employees while building and maintaining self-congratulatory momentum for pantomimed efforts at racial diversity that have produced anything but.

16.    And in the middle is the vast number middle managers and directors (and their enablers in human resources) striving to make the rank of highly compensated managing director by any means necessary.

17.    In this bizarro world of perverse incentives at the intersection of identify politics and profits, the shortest route from director to the holy grail of managing director is to hire and promote as many women as vacancies allow in the shortest amount of time possible.

18.   BlackRock has not been shy about publicizing the underpinnings of its discriminatory employment actions. Take former BlackRock managing director Kevin Chavers for instance. In February 2020, an interview entitled "Coffee with Kevin Chavers" was posted to YouTube. Beginning at the 2 minutes 45 seconds mark of the clip, Mr. Chavers can be heard rationalizing the lack of progress attained by Black professionals on Wall Street by stating that they are "only a few generations removed from involuntary servitude"(See Coffee With Kevin Chavers).

19.   Chavers' sentiments are perhaps most clearly manifest in near universal agreement among BlackRock hiring managers that "qualified minority candidates are hard to find, and BlackRock's offering to its Black employees to pursue "certification" through an on-line "management accelerator" created by a leading management consultancy. That BlackRock thinks so little of the talents and existing qualifications of its Black employees that it would rather have them chasing phony certificates than developing hard skills in coding or portfolio theory is a clear predicate for the unlawful employment actions it has taken against Plaintiff at all times relevant to this matter.

20.   Published remarks by defendant Michelle Edkins bookend those of Chavers and inform the reasons behind BlackRock's unlawful favoritism towards female employees. In February 2018, a lecture entitled "BlackRock's Position on Board Diversity" given by Edkins before an audience at the Markkula Center for Applied Ethics was posted to YouTube. Beginning at the 15 minutes and 19 seconds mark of the clip, defendant Edkins can be heard advocating for gender diversity on boards as the priority over racial/ethnic diversity: "we have never seen a board that had no women but four African American men and two Latino men" (See Edkins Gender Diversity Lecture. In Edkins reckoning, gender diversity begets racial diversity, a logical leap which meets its demise on BlackRock's organizational charts.

21.   BlackRock is "woke" run amok, with men and minorities alike left victimized in violation of Title VII and Section 1981.

## Jurisdiction and Venue

22.    This Court has jurisdiction pursuant to 28 U.S.C §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII and Section 1981. In addition, this Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 relating to declaratory judgments.

23.    This action seeks principally declaratory and injunctive relief, back pay, compensatory damages, and other relief to redress discrimination in employment. Plaintiff institutes this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000-e et seq., as amended by the Civil Rights Act of 1991; and 42 U.S.C. Section 1981 as amended by the Civil Rights Act of 1991 and made actionable through 42 U.S.C. Section 1983.

24.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

25.    Plaintiff Reginald Williams is a resident of Boston, Massachusetts. At all relevant times, Williams was an "employee" of BlackRock as defined by the applicable statutes.

26.    Defendant BlackRock is a foreign business corporation organized under the laws of the State of Delaware, with a principal place of business located at 55 East 52nd Street, New York, New York 10055. At all relevant times, BlackRock was an "employer" within the meaning of all relevant statutes.

27.    Defendant Michelle Edkins is BlackRock's Global Head of Investment Stewardship.

28.    Defendant Gassia Fox is BlackRock's Global Chief Operating Officer of Investment Stewardship and Public Policy.

29.    Defendant Jenny Chow is a BlackRock Vice President of human resources in charge of recruiting.

## FACTUAL ALLEGATIONS

### I.   A Sea of White Faces

30.   Plaintiff began work in Defendant's Boston, Massachusetts office in January 2018, as an Associate in Relationship Management.

31.   When Plaintiff arrived, he was one of only five Black employees among approximately 200 White full-time workers at Defendant's Boston location. Of those five Black employees one was Plaintiff's hiring manager and an analyst hired by that same manager. The two remaining Black employees in defendant's Boston office included a female director in another department and an administrative assistant.

32.   Despite Plaintiff and the analyst being the only two Black male non-manager employees in the office, white employees visiting the Boston office routinely confused one for the other, despite obvious height and age differences between the two.

### II.   Plaintiff Raises His Hand to No Avail

33.   Plaintiff arrived at defendant's having graduated Dartmouth and Tulane Law School, and after stints in law, international trade, and higher education administration. Plaintiff also had a command of Mandarin Chinese, having lived in Beijing for several years.

34.   In January 2020, after two years working diligently in the relationship management role into which he had been hired, Plaintiff began looking for opportunities among defendant's various teams and departments.

35.   Having worked as an employment lawyer and served as a federal law clerk, Plaintiff applied for a position on Defendant's employee relations team. Plaintiff's application was summarily denied.

36.   Plaintiff then expressed interest in a client contracts role closely related to his work in Relationship Management. That opportunity went unrealized, however, after the Atlanta-based hiring manager expressed an unwillingness for Plaintiff to work in the role from his

then-current location in defendant's Boston office; this despite that having been a common arrangement for other members of that team.

37.   On February 6, 2020, Plaintiff identified a vacancy he believed to be a perfect fit for him: a Vice President for communications role ("Communications Role") on defendant's vaunted Investment Stewardship team.

38.   Plaintiff met all the listed qualifications for the position: "undergraduate degree contributing to the development of strong research and writing skills"; "exceptional business writing and communication skills"; "fluency in and knowledge of investment management".

39.   As directed by defendant's "Internal First" internal hiring policy, Plaintiff shared his desire for the communications role with his manager and participated in an initial screening interview with defendant Jenny Chow, defendant's human resources official managing recruiting for the role.

40.   From the outset of the screening conversation, defendant Chow sought to dissuade Plaintiff from applying for communications role. Chow expressed no enthusiasm for Plaintiff's credentials for the role and queried Plaintiff whether he would be willing to apply for a more junior Associate's role on the Investment Stewardship Team.

41.   Plaintiff, however, was seeking the career mobility defendant BlackRock had advertised throughout his time there and committed to competing for the Vice President vacancy.

42.   On February 10, 2020, following the prescribed path to internal career movement at BlackRock, Plaintiff attempted to connect with defendant Michell Edkins, the hiring manager for communications role. Edkins demurred and directed Plaintiff to connect with Eric Shostal, formerly an Investment Stewardship communications team Vice President and the team's lone male employee but now no longer with the company.

43.    On February 11, 2020, Plaintiff submitted his application for the communications role and after satisfactory informational interviews with communications team vice president Shostal and an associate (Hilary Novik-Sandberg), Plaintiff eagerly awaited word of next steps in the recruiting process.

44.    On February 18, 2020, Plaintiff emailed defendant Chow for an update as to the status of his application after he became aware that the job posting for the communications role had been reposted. In response to Plaintiff's email, defendant Chow contacted Plaintiff by phone and assured him the reposting of the position to which he applied was nothing more than an administrative matter.

45.    On February 28, Plaintiff sent Chow an email inquiring about next steps in the recruiting process for the communications role to which Chow that a writing test would need to be completed.

46.    On March 6, Plaintiff emailed his completed writing test response to defendants Chow and Fox.

47.    Defendants subsequently scheduled Plaintiff to interview for communications role on March 20, 2021.

48.    On March 20, less than one hour from the 1PM start of the first of four interviews with senior BlackRock managers for the communications role, defendant Chow called Plaintiff to inform him that his interviews had been cancelled because of a hiring freeze resulting from the onset of the coronavirus pandemic and that he would be contacted once recruiting for the role resumed.

49.    On April 30, after becoming aware that BlackRock had hired a new Investment Stewardship head, Plaintiff inquired of defendant Chow whether recruiting for Investment Stewardship team vacancies had resumed. Chow responded, "we are still in a holding pattern for those roles" and that she would "definitely" let him know if there were any updates.

50.    Ever mindful of defendant's edict to raise one's hand for opportunities within the company and having just heard a senior

BlackRock senior executive ask for volunteers to join the company's initiatives in China, Plaintiff also reiterated to Chow his experience having worked in China and his willingness to do so again for BlackRock.

51.    Chow promised to find out more and inform Plaintiff about the company's opportunities in China but failed to follow up with him on the topic.

52.    On June 15, 2020, at the urging of his manager and after having noticed that new advertisements had been posted for vacancies on the Investment Stewardship team, including a communications role exactly the same as the position for which Plaintiff had been scheduled to interview but for a newly added Spanish-language requirement.

53.    Plaintiff again contacted defendant Chow regarding the status of the communications role for which he had been scheduled to interview in March 2020.

54.    On June 16, defendant Chow responded to Plaintiff that defendant Fox "is working closely with the [Investment Stewardship team] in determining critical needs and obtaining additional approvals before it comes to me. The [sic] comms role is a part of that discussion".

55.    On June 17, ever mindful of defendant's edict to raise one's hand for opportunities within the company and having become aware of a new vacancy on the Investment Stewardship proxy voting team, Plaintiff inquired of defendant Chow her assessment of his applying for that opportunity on a closely related team.

56.    Chow was enthusiastic, stating: "that's a great idea! This [Investment Stewardship proxy voting role] is a really good role that has [sic] encompasses writing, research, stakeholder mgmt [sic] and still works closely with michelle's [Edkin's] team. and [sic] Ray is also looking for someone who has a strong interest in [environmental, social, and governance issues]".

57.    On June 22, Plaintiff submitted his application for the Investment Stewardship proxy voting team vacancy. As with the Investment

Stewardship team communications team vacancy, Plaintiff met all of the listed requirements for the position.

58.     On June 25, 2020, Plaintiff became aware that the Investment Stewardship communications team vacancy to which he had applied, been previously scheduled for interviews, and about which he regularly requested status updates, had been filled. No prior notice had been given Plaintiff that recruiting for the position had resumed, despite his regular contact with defendant Chow.

59.     On that same day, Plaintiff complained to both his manager and defendant Chow regarding the unfairness of the recruiting process for the communications role.

60.     On June 26, Plaintiff's manager Dan Yifru ("Yifru") raised Plaintiff's plight with Anne Ackerley ("Ackerley"), managing director and head of BlackRock's $1T Retirement Group and informed Plaintiff that Ackerley was "as upset as he was" about how Plaintiff had been treated in competing for the communications role and that Ackerley would look into what happened.

61.     On July 8, Yifru told Plaintiff that Ackerley was "shocked" that no one had reached out to Plaintiff regarding the tainted recruitment for the communications role and that "she's trying to get some answers".

62.     In the interim, on July 7, Plaintiff emailed Investment Stewardship proxy voting team head and managing director Ray Cameron ("Cameron") that Plaintiff had submitted his application for the proxy voting position two weeks prior.

63.     On July 14, Plaintiff interviewed with Cameron by telephone, with Cameron's questions directed entirely on Plaintiff's resume. Plaintiff had previously been advised by defendant Chow to be prepared to discuss Environmental, Social, and Governance (ESG) issues as they relate to the biotech industry, as the proxy voting vacancy would be focused on biotech firms.

64.     On July 15, defendant Chow communicated to Plaintiff and his manager Yifru that Plaintiff's interview with Cameron had gone well

and that five additional interviews with members of Cameron's team would be scheduled.

65.    On July 20, however, Plaintiff became aware that the proxy voting role had been opened to external candidates and reposted. On that same day, defendant Chow informed Plaintiff that he should be prepared in subsequent interviews for the proxy voting role to "connect the dots more" regarding his resume. Plaintiff was then subjected to a series of perfunctory interviews focused only on highlighting Plaintiff's lack of formal proxy voting experience.

66.    On July 22, Plaintiff sent an email to defendant Chow, defendant's Global Head of Talent Acquisition Toretha McGuire ("McGuire"), and his manager Yifru expressing concern as to the fairness of defendant's internal recruiting process and defendant's commitment to promoting its Black professionals.

67.    Head of Talent Acquisition McGuire called Plaintiff soon after receiving his email of concern over BlackRock's commitment to Black professionals. In response to Plaintiff's concerns, McGuire posed to him a rhetorical question: "You're here [at BlackRock], aren't you?!"

68.    On July 6, 2020, Plaintiff became aware that defendants had used the communications role job posting with the newly added Spanish-language requirement to hire Victoria Gaytan, a Hispanic woman possessing similar or inferior qualifications as compared to those of Plaintiff.

69.    Defendants Edkins and Fox hired Mikayla Byfield, a Black female two years out of college, for the Associate level communications role to which defendant Chow initially attempted to steer Plaintiff. Defendants' Investment Stewardship communications team is now composed entirely of female employees.

70.    On September 2, 2020, Plaintiff applied for a second Investment Stewardship communications vacancy identical to the one he first applied for in February 2020. Plaintiff was later informed by defendants that he would not be interviewed for the role despite his being qualified and scheduled for interviews for the initial vacancy. Defendants

ultimately selected a white woman to fill the second Investment
Stewardship Communications vacancy.

71.    In late September 2020, Investment Stewardship proxy voting
team hiring manager Cameron informed Plaintiff that Plaintiff was a
"corporate athlete": someone capable of doing virtually any job at
BlackRock, but that Plaintiff did not express sufficient "enthusiasm" or
"curiosity" for Cameron to hire him for the proxy voting vacancy.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

72.    Plaintiff filed timely Charges of Discrimination against the
Defendant BlackRock with the Equal Employment Opportunity
Commission, and now files this Compliant within Ninety (90) days of
receiving his Notice of Rights.  Therefore, Plaintiff has exhausted his
administrative remedies.

## COUNT I

73.    Because of their actions as outlined above, Defendants have
engaged in unlawful employment discrimination based on race and sex
in violation of Title VII of the Civil Rights Act of 1964 as amended by
the Civil Rights Act of 1991.

## COUNT II

74.    Because of their actions as outlined above, the Defendants have
engaged in unlawful retaliation in violation of Title VII of the Civil
Rights Act of 1964 as amended by the Civil Rights Act of 1991.

## COUNT III

75.    Because of their actions as outlined above, Defendants have
engaged in unlawful discrimination based on race in violation of 42
U.S.C. Section 1981, as made actionable by 42 U.S.C. Section 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the
Defendants as follows:

(a) A declaratory judgment that the Defendants have engaged in unlawful discrimination and retaliation as set out in each Count listed above;

(b) Award Plaintiff all back pay and benefits to which he would have been entitled but for Defendants' unlawful discrimination against him.

(c) Award Plaintiff reasonable compensatory damages in the amount of

$525,000 for having to suffer the humiliation, stress, and embarrassment of this unlawful treatment; and,

(d) Award all costs and expenses in bringing this action and such other alternate relief as the court may deem just and proper.

/s/ Reginald Williams

Reginald Williams

399 Congress Street

Unit #303

Boston MA 02210

251-222-2709

reginald@williams-llc.com